UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN M., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, <br> ACTING COMMISSIONER OF SOCIAL SECURITY,[1] <br><br> Defendant. | No. 20 CV 1687 <br><br> Magistrate Judge McShain |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kathleen M. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying her application for benefits. For the following reasons, the Court grants plaintiff's request to reverse the SSA's decision and remand this case to the agency [17],[2] denies the Commissioner of Social Security's motion for summary judgment [19], and reverses the SSA's decision.

**Procedural Background**

Between late December 2015 and early January 2016, plaintiff filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income, both alleging an onset date of June 1, 2013. [14-1] 13. Plaintiff's claims were denied initially and on reconsideration. [*Id.*]. Plaintiff requested a hearing, which was held by an administrative law judge (ALJ) on March 21, 2018. [*Id.*]. In a decision dated February 7, 2019, the ALJ ruled that plaintiff was not disabled. [*Id.*] 37-38. The Appeals Council denied review on January 10, 2020, making the ALJ's decision the agency's final decision. [*Id.*] 1-3. *See* 20 C.F.R. §§ 404.955, 404.981.

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, with the exception of citations to the administrative record [14], which refer to the page numbers in the bottom right corner of each page.

Plaintiff timely appealed to this Court [1]. The Court has jurisdiction to review the Acting Commissioner's decision under 42 U.S.C. § 405(g), and the parties have consented to my jurisdiction over the case in accordance with 28 U.S.C. § 636(c). [9].

## Summary of Plaintiff's Medical and Non-Medical Evidence

Plaintiff, 52 years old at the time she applied for disability, was diagnosed with bipolar disorder when she was between 15 and 20 years old. [14-1] 30-31. Plaintiff's bipolar disorder went untreated for over twenty years. [*Id*.]. During this period plaintiff "self-medicate[d]" with street drugs. [*Id*.]. In addition to bipolar disorder, plaintiff was later diagnosed with schizophrenia, major depressive disorder, and generalized anxiety disorder. [*Id*.] 21. In January 2016, plaintiff was prescribed Risperdal, Carbamazepine, Lexapro, and Klonopin to treat the effects of these disorders. [*Id*.] 21, 31. Because of plaintiff's mental impairments plaintiff reported difficulty taking her prescribed medications. [*Id*.] 25. When plaintiff did not take her medications, her symptoms would worsen causing her to experience episodes of depression, insomnia, and hopelessness. [*Id*.] 31.

Plaintiff visited the emergency room three times between 2013 and 2015 for "chronic" skin rashes plaintiff herself caused when she picked "until she br[oke] the skin" because she believed "bugs [were] eating her inside out." [14-5] 448-454, 455-63, 464-69. During one visit that occurred a few months after the onset of plaintiff's disability, plaintiff told attending physician, Dr. Christopher Ross, M.D., that she had been off her prescribed antidepressant, Wellbutrin, for two months. [*Id*.] 465. Dr. Ross observed plaintiff was alert, oriented to person, cooperative, with the appropriate mood and affect. [*Id*.] 467. Dr. Ross diagnosed plaintiff with depression and delusional parasitosis and plaintiff was given a prescription for Wellbutrin and Risperidone, the latter being an antipsychotic used to treat schizophrenia and bipolar disorder. [*Id*.]. Plaintiff's discharge documents do not indicate that plaintiff was diagnosed or treated for substance abuse addiction. [*Id*.] 448-454, 455-63, 464-69. During her last visit plaintiff explicitly denied drug and alcohol abuse. [*Id*.] 453.

From October 2015 through November 2016 psychiatrist Paragini Chandarana, performed six psychiatric evaluations of plaintiff. [14-7] 625, 637, 639, 640, 677-78. During the initial psychiatric evaluation Dr. Chandarana noted fluctuating judgment orientation and memory and recorded plaintiff's delusion that she had bugs all over her body. [*Id*.] 625. Plaintiff also reported that she is easily angered, has a poor memory, and had stopped taking her prescribed medication for the past two to three months. [*Id*.]. She diagnosed plaintiff with bipolar disorder and assessed plaintiff's functioning as fair, with a Global Assessment of Functioning (GAF) score "around 60." [*Id*.].

In March 2016, Dr. Chandarana conducted a follow-up psychiatric evaluation where plaintiff reported that since taking her medications she does not see any bugs. [*Id.*] 637. Plaintiff also reported feeling "very anxious" and that "she does not see friends." [*Id.*]. Plaintiff denied drug use. [*Id.*]. Dr. Chandarana again observed plaintiff had fluctuating judgment, orientation, and memory, and diagnosed plaintiff with schizoaffective disorder bipolar type and in addition to Risperdal, prescribed plaintiff with Depakote and Tegretol to treat plaintiff's bipolar disorder and schizophrenia. [*Id.*]. During the second psychiatric follow-up evaluation in May 2016, plaintiff reported running out of medications for two weeks and scratching because she thought she had bugs on her body. [*Id.*] 639. Dr. Chandarana adjusted plaintiff's medications, adding Klonopin to plaintiff's prescription regimen. [*Id.*]. In June 2016, during plaintiff's third psychiatric follow-up evaluation, Dr. Chandarana notes indicate that symptoms of plaintiff's mental disorders worsened. [*Id.*] 640. She observed that plaintiff had schizoid personality traits and poor interpersonal skills. [*Id.*]. Plaintiff had fluctuating judgment, orientation, and memory, an affect that was labile and blunted at times, poor insight, and questionable compliance. [*Id.*]. Dr. Chandarana noted that plaintiff was "[n]ot intoxicated or going through withdrawal." [*Id.*]. During plaintiff's fourth psychiatric follow-up evaluation in October 2016, plaintiff admitted that she stopped taking her medications since July 2016 after her mother died and since experienced psychotic symptoms and delusions of bugs on her skin. [*Id.*] 677. Dr. Chandarana once again noted plaintiff had fluctuating judgment, orientation, and memory, poor insight, labile affect, and questionable compliance. [*Id.*]. Plaintiff was "[n]ot intoxicated or going through withdrawal." [*Id.*]. At plaintiff's last psychiatric follow-up with Dr. Chandarana in November 2016, plaintiff stated she was taking her medication and denied drug use. [*Id.*] 678. Dr. Chandarana observed plaintiff was "well-behaved, cooperative . . . not intoxicated or going through withdrawal." [*Id.*]. Plaintiff continued to have fluctuating judgment orientation and memory, poor insight, labile affect, and questionable compliance. [*Id.*].

Between September 2016 and September 2018, plaintiff had three inpatient hospitalizations for methadone maintenance treatment for her heroin dependence. [14-7] 664, [14-8] 734, [14-9] 808, 819, [14-10] 906, 926. Beginning January 27, 2016, through July 2016 plaintiff entered a substance abuse program at Rincon Family Services (Rincon) and received 171 methadone doses. [17] 2, [14-7] 658. While at Rincon, beginning in May 2016, plaintiff met monthly for individual counseling with licensed clinical social worker (LCSW) Rachel Clarke. [14-9] 841. On January 25, 2018, LCSW Clarke completed a Mental Impairment Questionnaire. [*Id.*] 841-43. When asked how often during a typical workday will your patient's symptoms interfere with the attention and concentration needed to perform even simple work tasks, LCSW Clarke responded by marking a box stating between 16-20% and further explained "[plaintiff] 'spaces out' often – has difficulty maintaining concentration for more than 15 min[utes] at a time during group therapy." [*Id.*] 843. In the questionnaire, LCSW Clarke also rated by degree plaintiff's functional limitations resulting from plaintiff's mental impairments. [*Id.*]. LCSW Clarke found plaintiff had

3

moderate limitations in understanding, remembering, or applying information and concentration, persistence, or maintaining pace and had mild limitations in interacting with others and in adapting or managing oneself. [*Id.*]. When asked to explain whether plaintiff's symptoms and limitations would remain in the absence of drug or alcohol use, LCSW Clarke remarked that plaintiff stated "she believed her psychosis and hallucinations were due to heroin use and that seeing bugs stopped once she quit using and got on Risperdal." [*Id.*]. LCSW Clarke also noted that she completed the questionnaire while plaintiff was receiving methadone maintenance treatment. [*Id.*].

In April 2016, while plaintiff was receiving methadone treatment at Rincon, she was examined by state agency clinical psychologist Jauren Kelly. [14-7] 642-44. Plaintiff reported taking her prescribed medications and working with LSCW Clarke for the past ten months. [*Id.*] 642. Plaintiff further stated she no longer hallucinates bugs crawling under her skin. [*Id.*]. Dr. Kelly's notes indicate that plaintiff last worked four years ago when she started hallucinating bugs crawling on her and plaintiff reported a history of manic episodes with racing thoughts, pacing, not sleeping, interrupting people and not wanting to finish things. [*Id.*] 642-43. Dr. Kelly conducted a mental status examination and found plaintiff alert, oriented to person, cooperative, had an adequate fund of information, and able to relate recent news events. [*Id.*] 643. Dr. Kelly also found plaintiff's mood depressed and plaintiff unable to compute simple multiplication equations. [*Id.*]. Among Dr. Kelly's conclusions, she diagnosed plaintiff with bipolar I disorder and found plaintiff's symptoms included manic episodes with racing thoughts, pacing and depressive episodes where plaintiff isolates. [*Id.*] 644.

In addition, non-examining state agency psychologists, Tyrone Hollerauer and Ellen Rozenfeld, each conducted mental RFC evaluations of plaintiff and concluded that plaintiff was moderately limited in maintaining concentration, persistence, or pace. [14-2] 106, 131. Both psychologists' evaluations included plaintiff's report that she complied with her medication and was not using drugs. [*Id.*]. Further, Dr. Hollerauer and Dr. Rozenfeld each noted that plaintiff has "difficulty with detailed instructions due to memory and concentration deficits." [*Id.*] 108, 133. Dr. Hollerauer explained that while plaintiff is not "significantly limited" in her ability to complete a normal workday without interruptions from psychologically based symptoms, she is limited to 1-2 step tasks. [*Id.*] 108-09, 119-20.

Plaintiff, her mother, and her friend completed function reports. [14-4] 332-43, 344-56, 368-78, 379-89. Plaintiff's reports (dated February 25, 2016, and August 19, 2016) detail that her mental impairments cause her to suffer from auditory and visual hallucinations, mood instability, hyperactivity, and mania. [*Id.*] 348, 354. Further, plaintiff reported that these symptoms severely affect her ability to concentrate, retain information, follow instructions, get along with others, and complete tasks. [*Id.*] 353, 387. Plaintiff also remarked that she needs help or reminders to take her

4

medication. [*Id.*] 350, 384. Plaintiff stated that despite her psychiatrist increasing her medication dosage, she continued to "hallucinat[e]" and suffer from "severe anxiety attacks" and "severe depression." [*Id.*] 382. Plaintiff's mother's and friend's reports are consistent with plaintiff's report. [*Id.*] 332-43, 379-89.

On March 21, 2018, plaintiff testified at the administrative hearing that she stopped work and was unable to work in part because of visual hallucinations that cause her to believe bugs are under her skin. [14-1] 86, 88. Plaintiff acknowledged that medication helped her mental disorder symptoms, including the hallucinations; however, when the ALJ asked plaintiff to confirm that when she went on her medication her hallucinations "decrease[d] to the point of not being an issue anymore," plaintiff stated "No, it's an issue but not like it was." [*Id.*] 87. Further, when the ALJ asked plaintiff whether her medication "completely eliminated [her] anger issues," she said no. [*Id.*] 94.

## Legal Standard

Under the Social Security Act, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a sequential five-step inquiry: (1) whether the claimant has performed any substantial gainful activity during the period for which he claims disability; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform his past relevant work (i.e., the claimant retains the residual functional capacity (RFC) to perform his past); and (5) whether the claimant is unable to perform any other available work in light of his age, education, and work experience (i.e., able to perform any other work existing in significant numbers in the national economy). *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that the claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

However, "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). If an ALJ finds that a claimant is disabled and has medical evidence of alcoholism or drug abuse, the ALJ must determine whether alcoholism or drug addiction is a contributing factor material to a determination of disability. 20 C.F.R.

5

§ 404.1535(a). To do so, the ALJ applies the five-step inquiry a second time to determine whether the claimant would still be disabled if her alcohol or drug use stopped. 20 C.F.R. §§ 404.1535(b), 416.935. Specifically, the ALJ will evaluate whether the limitations on which the disability determination is based would remain if the claimant stopped using drugs or alcohol and then determine whether any or all of those remaining limitations would be disabling. 20 C.F.R. § 404.1535(b). Where a claimant has co-occurring mental disorders, the relevant question is whether these disorders would improve to the point of nondisability in the absence of substance abuse. *See Simpson v. Berryhill*, 17-cv-2299, 2018 WL 2238593, at *13 (May 16, 2018) (quoting Social Security Ruling (SSR)13-2p, 2013 WL 621536, at *9). If the record is fully developed and the evidence does not establish claimant's co-occurring mental disorders would improve to the point of nondisability, the claimant's substance abuse is not material to a determination of disability. *Id.* Conversely, if the remaining limitations would not be disabling or co-occurring mental disorders would improve to the point of nondisability, substance abuse is a contributing factor material to the determination of disability and payment of benefits is statutorily barred. 20 C.F.R. § 404.1535(b); *see* SSR 13-2p, 2013 WL 621536, at *9. While plaintiff bears the burden to prove that substance abuse is not a contributing factor material to her disability, the ALJ must still "adequately disentangle" the effects of a plaintiff's substance abuse from those of her other impairments. *Harlin v. Astrue*, 429 Fed. App'x 564, 567-68 (7th Cir. 2011).

"The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. §405 (g). Substantial evidence is a standard that "requires more than a mere scintilla of proof and instead such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walker v. Berryhill*, 900 F.3d 479, 482 (7th Cir. 2018). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). But the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted); *see also Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) ("When an ALJ recommends that the agency deny benefits, it must first 'build an accurate and logical bridge from the evidence to the conclusion.'") (internal citation omitted).

### The ALJ's Decision

At Step One, the ALJ found that plaintiff had not performed substantial gainful activity since her alleged onset date of June 1, 2013. [14-1] 16. At Step Two, the ALJ determined that plaintiff had the following severe impairments: depressive disorder; generalized anxiety disorder; schizoaffective disorder; chronic obstructive

pulmonary disease (COPD); knee pain status post remote arthroscopic surgery; carpal tunnel syndrome; as well as substance addiction disorder." [*Id.*] 17.

At Step Three, the ALJ ruled that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. [*Id.*]. During Step Three, the ALJ considered whether plaintiff's mental impairments satisfied the "Paragraph B" criteria. [*Id.*] 19. Considering plaintiff's mental disorders, including substance abuse, the ALJ found that plaintiff has moderate limitations in understanding, remembering, or applying information; interacting with others; and adapting or managing oneself. [*Id.*] 19-20. The ALJ additionally found that plaintiff has a marked limitation with regard to concentrating, persisting, or maintaining pace. [*Id.*] 19.

Before turning to Step Four, the ALJ found that, considering the entire record, including the substance use disorder, plaintiff had the RFC to perform medium work as defined in 20 C.F.R. §§ 404.1567(c) and 416.967(c) except plaintiff could: occasionally climb ladders, ropes, or scaffolds; occasionally kneel, crouch, and crawl; frequently finger with the bilateral upper extremities; and tolerate frequent exposure to odors, dust, fumes, gases, and other pulmonary irritants. [*Id.*] 20. The ALJ also found plaintiff retained the capacity to understand, remember, concentrate, persist, and perform simple, routine, and repetitive work in a low stress environment, which is defined as having few, if any, work-related decisions, and few, if any changes in the work setting. [*Id.*]. The ALJ then added three limitations to the RFC: plaintiff must have no interaction with the public and only occasional interaction with coworkers; she would need a break every two hours for fifteen minutes, which can be accommodated by routine breaks and lunch; and she would be unable to properly interact with co-workers and supervisors and would be off task greater than 20% of the workday due to use of illegal substances. [*Id.*].

In making this finding, the ALJ considered plaintiff's administrative hearing testimony and medical evidence, specifically: (a) plaintiff's diagnoses of multiple psychological disorders; (b) plaintiff's prescribed treatment plan; (c) treatment notes; and (d) plaintiff's record of inpatient hospitalizations. [*Id.*] 20-21. The ALJ focused on treatment notes during periods when plaintiff was using heroin to demonstrate that heroin use exacerbated plaintiff's mental symptoms. [*Id.*]. She also pointed out that plaintiff's inpatient hospitalizations were to treat plaintiff's heroin dependence. [*Id.*]. The ALJ ultimately concluded, upon review of the medical evidence, that substance abuse significantly deteriorates plaintiff's mental functioning. [*Id.*] 21.

At Step Four, the ALJ ruled that plaintiff was unable to perform her past relevant work but, absent the substance abuse, she would have the RFC to perform medium work. [*Id.*] 21, 26. The ALJ then added the following limitations: plaintiff must have no interaction with the public and only occasional interaction with

coworkers; and she would need a break every two hours for fifteen minutes, which can be accommodated by routine breaks and lunch. [*Id.*] 26.

In making this determination, the ALJ re-evaluated whether plaintiff's mental impairments satisfied the "Paragraph B" criteria, absent substance abuse. [*Id.*] 25. As the ALJ explained, referring to Social Security Ruling 96-8p, while the "limitations identified in the paragraph B criteria are not a [RFC] assessment" but rather "rate the severity of mental impairments at steps 2 and 3" the identified limitations nonetheless inform the RFC assessment which requires "a more detailed assessment by itemizing various functions contained in [paragraph B's] broad categories." [*Id.*] 20. In addition, the RFC "reflects the degree of limitation" the ALJ "found in the paragraph B mental function analysis." [*Id.*].

The ALJ continued to find that plaintiff has a moderate limitation interacting with others. [*Id.*] 25. The ALJ reduced plaintiff's limitation from moderate to mild with regard to understanding, remembering, or applying information; and adapting or managing oneself. [*Id.*]. The ALJ also reduced plaintiff's limitation from marked to moderate regarding plaintiff's ability to concentrate, persist, or maintain pace. [*Id.*].

The ALJ then detailed the weight she gave to the medical and other evidence in this matter, and her reasoning for such weight, as follows:

- The ALJ gave great weight to the opinions of non-examining state agency psychological consultants. [*Id.*] 36. While the ALJ acknowledged the consultants were non-examining sources and thus entitled to less weight than the opinion of a treating or examining source, the ALJ nonetheless concluded the consultants' opinions were entitled to great weight because they were medical specialists who reviewed the bulk of the available medical evidence in the record and understood social security disability programs and evidentiary requirements. [*Id.*].

- The ALJ gave good weight to Dr. Kelly's opinion [*Id.*] 34. While Dr. Kelly did not provide an assessment of plaintiff's ability to perform mental work activities beyond the results of Dr. Kelly's clinical testing, the ALJ nonetheless found Dr. Kelly's observation notes and diagnostic impressions "instructive" to the ALJ's ultimate decision. [*Id.*].

- The ALJ gave partial weight to the opinions of LCSW Clarke contained in the Mental Impairment Questionnaire [*Id.*] 35. The ALJ found LCSW Clarke was not an acceptable medical source who can establish the existence of a medically determinable impairment or provide a medically-based opinion. [*Id.*]. Further,

8

the ALJ noted LCSW Clarke did not have a longitudinal treatment plaintiff. [*Id.*]. While the ALJ acknowledged that LCSW Clarke conducted the most thorough assessment of claimant's mental functioning, the ALJ found LCSW Clarke's professed limitations inherently contradictory and vague. [*Id.*].

- The ALJ gave partial weight to plaintiff's Global Assessment of Functioning (GAF) scores explaining that these scores are "less definitive with respect to . . . functioning," "subject to variability day to day," and "generally represent only a "snapshot" of plaintiff's functioning. [*Id.*] 35.

- The ALJ gave little weight to the function reports of plaintiff's friend and her mother reasoning that these persons are not medically trained and are biased because of their relationship with plaintiff. [*Id.*] 36.

At Step Five, the ALJ found that, absent her substance abuse, plaintiff could perform jobs that exist in significant numbers in the national economy. [*Id.*] 36-37. The ALJ concluded plaintiff's substance abuse disorder was a contributing factor material to the determination of disability and that a finding of "not disabled" was appropriate. [*Id.*] 37.

## Discussion

Plaintiff alleges the ALJ made two errors. [17]. First, plaintiff argues the ALJ's RFC assessment, not considering plaintiff's substance abuse, is unsupported by substantial evidence because the ALJ failed to explain why plaintiff would be off-task 20% of the workday while using drugs but not similarly off-task if she stopped using drugs, considering plaintiff's co-occurring mental impairments. [*Id.*] 8-10. Second, she argues the ALJ erred when she dismissed evidence from plaintiff's mother and friend that described plaintiff's symptoms and behaviors on account of bias. [*Id.*] 15. The Court agrees with plaintiff and finds that, due to errors made by the ALJ, substantial evidence does not support the decision to deny benefits and that the case must be remanded for further proceedings.[3]

### I. The ALJ's Elimination of Plaintiff's Off-Task Limitation, Absent Substance Abuse, is Unsupported by Substantial Evidence

"A disability claimant's RFC describes the maximum she can do in a work setting despite her mental and physical limitations." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). "An ALJ must evaluate all relevant evidence when determining an applicant's RFC[.]" *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must

---

[3] Because the errors discussed herein are dispositive, the Court need not address the other issues raised by plaintiff.

connect the evidence to the conclusion; in doing so he may not ignore entire lines of contrary evidence." *Id.* at 592. An ALJ "must explain [her] analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Moira L. v. Kijakazi*, No. 19 C 2687, 2022 WL 846469, at *2.

In determining plaintiff's RFC, considering plaintiff's substance abuse, the ALJ found that plaintiff has a marked limitation with regard to concentrating, persisting, or maintaining pace. [14-1] 19. The ALJ explained that a "marked limitation is a seriously limited ability to function in the area independently, appropriately, effectively and on a sustained basis." [*Id.*]. The ALJ concluded a marked limitation was appropriate considering plaintiff's problems with memory, concentration, understanding, and task completion. [*Id.*]. The ALJ also cited plaintiff's hospitalizations that the ALJ found were necessitated by plaintiff's heroin use. [*Id.*].

In turn, plaintiff's RFC, considering substance abuse, included a mental limitation that plaintiff "would be off task greater than 20% of the workday due to use of illegal substances." [*Id.*] 20. The ALJ incorporated this limitation into the below hypothetical posed to the vocational expert who testified that plaintiff would be precluded from all work:

> Q: Hypothetical #3 is going to be at the medium level of exertion, occasional ladders, ropes or scaffolds, occasional kneeling, crouching, and crawling, Fingering, bilaterally, is limited to frequent, frequent exposure to odors, dust, fumes, gases, and other pulmonary irritants. The individual retains the capacity to understand, remember, concentrate, persist, and perform simple, routine, repetitive work in a low-stress environment defined as having few, if any, work-related decisions, and few, if any, changes in the work setting, no interaction with the public and only occasional interaction with co-workers. The individual would need a break every two hours for 15 minutes, which can be accommodated by routine breaks and lunch. However, the individual would be unable to properly interact with co-workers and supervisors and be off-task greater than 20% of the workday due to use of illegal substances. I presume past work has been eliminated, is that correct?
>
> A: Correct.
>
> Q: Any other work for such an individual in the national economy?
>
> A: Based on my professional experience, I would rule out all work.

[*Id.*] 60-61.

When the ALJ re-evaluated plaintiff's limitations under the Paragraph B criteria, if plaintiff stopped using drugs, the ALJ concluded plaintiff had a moderate instead of marked limitation in concentrating, persisting or maintaining pace. [*Id.*] 25. The ALJ reasoned that "during periods of sobriety and relative compliance with her . . . medication," plaintiff reported improved symptoms and an intention to return to work and treatment providers observed that plaintiff had "cheerful affect," "euthymic mood, or generally appropriate thought processes, thought content, and overall cognitive functioning" while sober. [*Id.*] 25, 28-29. The ALJ's recalculated RFC, if plaintiff stopped drug use, did not contain an off-task limitation. [*Id.*] 26.

Plaintiff contends the ALJ failed to explain why she concluded plaintiff would be off-task more than 20% of the workday while using drugs but, not similarly off-task if she stopped using drugs. [17] 8-10. The Commissioner replies, "[t]he answer is easy: no opinion found that plaintiff needed additional off-task time [when not abusing substances], not even LCSW Clarke." [20] 9. The Court finds the Commissioner's statement in part misleading as the Commissioner's brief also later states, "it was not clear whether LCSW Clarke made this assessment in light of plaintiff's heroin use, which LCSW Clarke noted was moderate," referring to LCSW's finding that plaintiff's symptoms would interfere with attention and concentration for even simple tasks for 16 to 20 percent of the workday. [*Id.*] 12, [14-9] 843.

The Court agrees with the Commissioner that the ALJ does offer some explanation why plaintiff would have no off-task limitation if she stopped using drugs, specifically that plaintiff's symptoms improve when she is sober and taking her prescribed medications. However, the ALJ in deciding that plaintiff would no longer be off-task if she stopped using drugs, failed to address evidence from treating psychiatrists that indicate plaintiff's mental-disorder related symptoms continued, and at times worsened, when plaintiff was sober. For this reason, the Court ultimately finds that substantial evidence does not support the ALJ's finding that plaintiff would not be off-task if plaintiff stopped using drugs.

Here, the ALJ only partially discussed treating psychiatrist Dr. Syed Khadri's treatment notes while ignoring portions that demonstrated plaintiff's symptoms did not improve, but persisted, when plaintiff ceased using drugs. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citing *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009)). In support of the ALJ's finding that plaintiff would not be disabled if she stopped using drugs, the ALJ focused on Dr. Khadri's treatment notes during psychiatric follow-up visits that reported plaintiff was "cooperative" and "goal-directed" as well as demonstrated appropriate thought processes, thought content and orientation. [14-7] 681, 683, 685. The ALJ's opinion omits that during these same visits Dr. Khadri noted that plaintiff reported "severe

11

anxiety," "poor sleep," reoccurring anxiety attacks despite taking her prescribed Klonopin, "mood swings and rushing thoughts," and depressed mood. [*Id.*] 680-81.

Relatedly, the ALJ's discussion skips over the treatment notes of plaintiff's other treating psychiatrist and Dr. Khadri's colleague at Pilsen Psychiatric Clinic, Dr. Chandarana, that also demonstrate plaintiff's symptoms persisted and worsened during periods of sobriety. In three follow-up psychiatric evaluations, Dr. Chandarana noted plaintiff was sober, stating in each report that plaintiff was "[n]ot intoxicated or going through withdrawal." [*Id.*] 640, 677-78. During plaintiff's third psychiatric follow-up evaluation, Dr. Chandarana notes indicate that symptoms of plaintiff's mental disorders worsened. [*Id.*] 640. She observed that plaintiff had "schizoid personality traits and poor interpersonal skills." [*Id.*]. Plaintiff had fluctuating judgment and memory, an affect that was labile and blunted at times, poor insight, and questionable compliance. [*Id.*]. During plaintiff's fourth psychiatric follow-up, plaintiff reported experiencing psychotic symptoms and delusions of bugs on her skin. [*Id.*] 677. Dr. Chandarana once again noted plaintiff had fluctuating judgment, orientation, and memory, poor insight, labile affect, and questionable compliance. [*Id.*]. At plaintiff's last psychiatric follow-up, Dr. Chandarana observed plaintiff continued to have fluctuating judgment, orientation, and memory, poor insight, labile affect, and questionable compliance. [*Id.*] 678. There is no indication that the ALJ considered this evidence reflecting plaintiff's mental impairments during periods of sobriety when she concluded that if plaintiff stopped using drugs she would have no off-task limitation, a limitation that would preclude plaintiff from all work, according to the vocational expert's testimony quoted above. For these reasons, it was error for the ALJ to cherry pick from plaintiff's treating psychiatrists' treatment notes to support a denial of benefits.

> II. **The ALJ Erred When She Failed to Evaluate Third-Party Observations of Plaintiff's Functioning before Finding Substance Abuse Material to Disability**

"Observations made by third-parties are valid sources for an ALJ to consider in the materiality analysis." *Negron v. Colvin*, No. 15-cv-4156, 2017 WL 985642 at *9 (N.D. Ill. March 14, 2017). Social Security Ruling 13-2p explains:

> Many claimants with Substance Abuse Disorders receive care from "other" non-medical and medical sources that are not acceptable medical sources. Evidence from these sources can be helpful to the adjudicator in determining the severity of [drug addiction and alcoholism (DAA)] and whether DAA is material to the finding of disability. Examples of "other" nonmedical sources include…family members [and] friends…Information from "other" sources can describe a claimant's functioning over time and can be especially helpful in documenting the severity of DAA because it supplements the medical evidence of record . . . "Other" source opinions . . . can document how well the claimant

12

is performing activities of daily living in the presence of a comorbid impairment. In many cases, evidence from "other" sources may be the most important information in the case record for these documentation issues.

SSR 13-2p, 2013 WL 621536, at *11.

Here, the ALJ failed to discuss either plaintiff's mother's or friend's observations of plaintiff, including portions that supported a disability finding. [14-1] 23-48. Plaintiff's mother reported that because of plaintiff's conditions she "can't sleep for days," "can't focus [or] sit still," she is "moody" and "irritable," and she needs reminders to take her medications. [14-4] 336-38. Her mother also stated that plaintiff goes outside "only when necessary" due to "anxiety attacks," has no hobbies, does not spend time with others, and self-isolates. [*Id.*] 339-41. Additionally, plaintiff's mother wrote that her conditions affect her memory, concentration, understanding, and ability to follow instructions and complete tasks. [*Id.*] 341. The observations of plaintiff's friend are consistent with her mother's. [*Id.*] 368-78. Plaintiff's friend has been friends with plaintiff for four years and interacts with her daily. [*Id.*] 371. Her friend described that plaintiff's conditions make her "unable to concentrate," caused "severe depression" and a "general lack of interest." [*Id.*]. The friend further explained that plaintiff's daily activities are "very mood dependent" as plaintiff suffers from "constant anxiety attacks," and that plaintiff only sleeps "three to four hours a night." [*Id.*] 372. Plaintiff's friend used "sporadic" to describe plaintiff's ability to pay attention, follow instructions, and get along with authority figures. [*Id.*] 376-77. Finally, the friend mentioned plaintiff's visual hallucinations. [*Id.*] 377. The ALJ did not cite or otherwise discuss these observations other than stating she considered them but, accorded them "little weight because there is no indication that [plaintiff's friend and mother] are medically trained to make exacting observations [and] by virtue of their relationship with the claimant, their statement cannot be considered the observations of a disinterested third-party witness." [14-1] 36.

The ALJ's failure to discuss these third-party observations was an error in her materiality analysis. *See Negron*, 2017 WL 985642 at *9 (ALJ erred in finding plaintiff's substance abuse material where ALJ partially discussed claimant's mother's testimony, ignoring testimony that supported a disability finding). The ALJ's reason to discount plaintiff's friend's and mother's statements, because of bias attributable to their relationship with plaintiff, is insufficient. *See Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013) (ALJ erred in automatically discounting testimony of claimant's fiancée where ALJ did not state whether he believed the fiancée's testimony or whether he knew how much of her testimony was true). Moreover, SSR 13-2p's explicit directive for ALJs to consider statements of family members and friends in conducting their materiality analysis would be obsolete if ALJs could outright disregard these observations for the reasons the ALJ cites. The ALJ's failure to discuss, or even indicate that she reviewed, the observations contained in the function reports of plaintiff's family member or friend, led to the ALJ ignoring

13

evidence in the record that the symptoms of plaintiff's mental impairments do not improve to the point of nondisability during periods of sobriety, evidence in support of finding plaintiff's substance abuse not material to a finding of disability.

  For that reason, as well as the other reasons discussed above, the case must be remanded.

## Conclusion

  The decision of the SSA is reversed, and in accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

*[Signature: Heather K. McShain]*

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: January 10, 2023**